**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

ALAN. L. M.,[1]

      Plaintiff,

        v.                      CASE NO. 1:21-CV-325-MGG

COMISSIONER OF SOCIAL SECURITY,

      Defendants.

**OPINION and ORDER**

Plaintiff Alan L. M. ("Mr. M") seeks judicial review of the Social Security

Commissioner's decision denying his applications for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the

Social Security Act ("the Act"). This Court may enter a ruling based on the parties'

consent pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g). For the reasons discussed

below, the Court **AFFIRMS** the decision of the Commissioner of the Social Security

Administration ("SSA").

I.    **OVERVIEW OF THE CASE**

Mr. M applied for DIB and SSI on June 20, 2019, alleging a disability onset date of

September 15, 2017. Mr. M's applications for DIB and SSI were denied initially on

September 17, 2019, and upon reconsideration on January 17, 2020. Following a

telephone hearing on November 24, 2020, an Administrative Law Judge ("ALJ") issued

---

[1] To protect privacy interests, and consistent with the recommendation of the Judicial Conference, the Court refers to the plaintiff by first name, middle initial, and last initial only.

a decision on January 11, 2021, finding that Mr. M was not disabled, conducting the requisite five-step analysis for evaluating claims for disability benefits. 20 C.F.R. § 404.1520; 416.920.[2]

At Step One, an ALJ's inquiry focuses on whether a claimant is engaging in substantial gainful activity. Here, the ALJ determined that Mr. M had not engaged in substantial gainful activity from his alleged onset date of September 15, 2017, through the date of ALJ's decision on January 11, 2021. Although Mr. M did work three hours a week mowing grass during this period, the ALJ found that this work activity did not rise to the level of substantial gainful activity. [DE 12 at 21].

At Step Two, an ALJ's inquiry focuses on whether a claimant's impairments are severe. For an impairment to be considered severe, an impairment or combination of impairments must significantly limit the claimant's ability to perform basic work-related activities. 20 C.F.R. § 404.1521. Here, the ALJ found that Mr. M suffered from the severe impairments of degenerative disc disease and stenosis of the cervical spine, degenerative disc disease of the lumbar spine, and chronic obstructive pulmonary disease. 20 CFR 404.1520(c). [DE 12 at 23]. On the other hand, an impairment is considered non-severe when the medical evidence establishes only a slight abnormality or combination of slight abnormalities that would have no more than a minimal effect on a claimant's ability to perform basic work functions. *See, e.g.,* 20 C.F.R. § 404.1522;

---

[2] Regulations governing applications for DIB and SSI are almost identical and are found at 20 C.F.R. § 404 and 20 C.F.R. § 416 respectively. Going forward, this Opinion and Order will only refer to 20 C.F.R. § 404 unless explicit distinction between the DIB and SSI regulations is necessary.

S.S.R. 85-28, 1985 WL 56856 (Jan. 1, 1985). The ALJ found that Mr. M's anxiety, depression, and historical alcohol use disorder were non-severe impairments (even when considered together). The ALJ also found that Mr. M's prior alcohol use disorder was not material as Mr. M had been in remission for two years. [DE 12 at 23].

At Step Three, an ALJ's inquiry considers whether any of the claimant's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404. Here, the ALJ found that none of Mr. M's severe impairments met or medically equaled the severity of one of the listed impairments in Appendix 1. In making this finding, the ALJ considered listings 1.04 (Disorders of the spine) and 3.02 (Chronic respiratory disorders).

Accordingly, before moving on to Step Four, the ALJ proceeded to determine whether Mr. M can perform his past relevant work based on his residual functional capacity ("RFC"). A claimant's RFC includes limitations for all medically determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). The RFC is the most that the individual can do despite his limitations. 20 C.F.R. § 404.1545(a). Physical exertion levels in an RFC are classified as either sedentary, light, medium, heavy, or very heavy. 20 C.F.R. § 404.1567. Here, the ALJ found that Mr. M had the residual functional capacity ("RFC") to perform light exertional work as defined in 20 C.F.R. § 404.1567(b), but with certain additional limitations. These included limitations to only occasional bending, stooping, crouching, crawling, kneeling, and climbing; and an avoidance of concentrated exposure to respiratory irritants.

The ALJ noted that Mr. M had previous relevant work as a donut icer. Given Mr. M's RFC, the ALJ found that Mr. M can perform his past relevant work as a donut icer, both as actually performed and as generally performed. Based on these findings, the ALJ found that Mr. M is not disabled within the meaning of the Act and denied his request for DIB and SSI benefits.

The ALJ's decision became the final decision of the Commissioner when the SSA Appeals Council declined review on June 28, 2021. *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005). Mr. M timely sought judicial review of the Commissioner's decision on August 25, 2021. Mr. M filed his opening brief on February 7, 2022, and the Commissioner filed her Memorandum in Support of Decision on April 18, 2022. This matter became ripe when Mr. M filed his reply on May 6, 2022.

## II.   STANDARD OF REVIEW

Although this Court can review a disability decision by the Commissioner pursuant to 42 U.S.C. §405(g), this Court's role in reviewing Social Security cases is limited. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). The Court must uphold the ALJ's decision so long as it is supported by substantial evidence. *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) (citing *Similia v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009)). At a minimum, an ALJ must articulate his analysis of the record to allow the reviewing court to trace the path of his reasoning and to be assured the ALJ has considered the important evidence in the record. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). While the ALJ need not specifically address every piece of evidence in the record to present the requisite "logical bridge" from the evidence to her conclusions, the ALJ

must at least provide a glimpse into the reasoning behind her analysis and the decision to deny benefits. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); see also *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). However, an ALJ's decision cannot stand if it lacks evidentiary support or inadequately discusses the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). An ALJ's decision will lack sufficient evidentiary support and require remand if the ALJ "cherry-picked" the record to support a finding of non-disability. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Wilson v. Colvin*, 48 F. Supp. 3d 1140, 1147 (N.D. Ill. 2014).

Thus, the question upon judicial review is not whether the claimant is, in fact, disabled, but whether the ALJ used "the correct legal standards and the decision [was] supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2007).

## III.   ANALYSIS

Mr. M raises two overarching challenges to the ALJ's decision. First, Mr. M contends that the RFC is not supported by substantial evidence because the ALJ made several errors when considering the report provided by Dr. Revathi Bingi, a psychologist who conducted a consultative psychological exam of Mr. M on September 11, 2019. Second, Mr. M argues that the ALJ's RFC analysis is not supported by substantial evidence because the ALJ failed to properly evaluate Mr. M's subjective symptoms. The Court addresses each issue in turn.

## A.      The ALJ's Evaluation of Dr. Bingi's Report

Mr. M's first challenge concerns the ALJ's treatment of Dr. Bingi's report in the decision. Before addressing Mr. M's arguments, the Court first recounts relevant portions of Dr. Bingi's report and the ALJ's decision.

### 1.      Overview of Dr. Bingi's Report

Mr. M met with Dr. Bingi for a consultative psychological examination on September 11, 2019, upon referral of the SSA. [DE 12 at 521]. During this examination, Mr. M discussed his overall mental health history, which Dr. Bingi recorded along with his own impressions of Mr. M's behavior and presentation. Dr. Bingi also administered a mental status exam and issued a report detailing her findings and diagnostic impressions.

During the examination, Mr. M reported feeling anxiety, insomnia, emotional sensitivity, fatigue, feelings of worthlessness, poor focus, and a racing mind. Mr. M also reported that he had trouble holding a full-time job because of poor stress tolerance and absenteeism, and that some days he had no energy—telling Dr. Bingi that he spent the entire Monday before the evaluation in bed. [*See id.*] Mr. M also told Dr. Bingi about an incident of suicidal ideation in 1998 while he was drinking excessively, but Mr. M reported no recent suicidal ideation. [*Id.* at 522]. Dr. Bingi observed that Mr. M appeared lethargic, demonstrated severely depressed mood, and was not very interpersonally engaging during the examination. [*Id.* at 521]. However, Dr. Bingi also noted that Mr. M appeared "bright and insightful" and that he had adequate mental functioning skills. [*Id.* at 524].

6

Dr. Bingi conducted a mental status exam where Mr. M could interpret proverbs, explain similarities and differences between different objects and animals, recall two out of three objects in five minutes, complete mathematical problems without error, complete his serial sevens test, and show good judgment and insight.

Lastlly, Dr. Bingi listed two diagnostic impressions for Mr. M in this report, one of which was "Major Depression, Recurrent, Severe." [*Id.*].

### 2.   The ALJ's Discussion of Dr. Bingi's Report in the Decision

The ALJ referenced Dr. Bingi's report as part of the ALJ's evaluation of Mr. M's depression, anxiety, and historical alcohol use disorder under the four broad areas of mental functioning (the "paragraph B" criteria) at Step Two and as part of the discussion of the persuasiveness of the State Agency psychologists' medical opinions.

At Step Two, the ALJ cited Mr. M's hearing testimony as well as to findings from Dr. Bingi's report (Exhibit 7F), Mr. M's function reports, and Mr. M's treatment records from Lutheran Health and Fort Wayne Orthopedics (Exhibits 3F, 9F). The ALJ found that Mr. M's mental impairments caused no more than "mild" limitation in any of the four functional areas, and that the evidence does not otherwise indicate there is more than a minimal limitation in the claimant's ability to do basic work activities. Thus, the ALJ ultimately considered these impairments non-severe under 20 C.F.R. 404.1520a(d)(1).

First, in understanding, remembering, or applying information, the ALJ found that Mr. M had mild limitations. Although the ALJ acknowledged that Mr. M reported that he struggled to complete tasks, the ALJ also observed that in his function report,

7

Mr. M stated that he could perform household chores and yard work, prepare meals, pay bills, go to doctor's appointments, take medications, shop, drive, and read. [DE 12 at 278-275]. The ALJ also cited to findings from Dr. Bingi's report where Mr. M shared his health, followed instructions from healthcare providers, complied with treatment outside of a doctor's office or hospital, and responded to questions from medical providers, as well as performed well on tasks involving long-term memory and general knowledge [DE 12 at 22]. The ALJ also noted that Mr. M could describe his prior work history during the hearing. *Id*.

Second, the ALJ found Mr. M had no limitations in interacting with others. Although the ALJ acknowledged that Mr. M reported difficulty engaging in social activities, the ALJ also found that, according to other statements in Mr. M's function reports, Mr. M could get along with others, shop, spend time with friends and family, attend church, and deal appropriately with authority. [DE 12 at 22]. The ALJ also noted Mr. M's orthopedic treatment records where he was described as very pleasant. [DE 12 at 549].

Third, the ALJ found Mr. M had mild limitations in his ability to concentrate, persist, or maintain pace. Although the ALJ acknowledged that Mr. M stated in his function report that he had trouble concentrating, that he needed a break after 10 minutes, and struggled to complete tasks, the ALJ noted that Mr. M could still drive, cook, read, manage funds, handle his medical care, and attend church. [DE 12 at 25]. The ALJ also referenced Dr. Bingi's findings that Mr. M completed tasks requiring significant concentration, such as subtracting serial sevens from one hundred and

8

interpreting proverbs. [DE 12 at 525 to 527]. Lastly, the ALJ found the record void of any mention of distractibility.

Finally, the ALJ observed that Mr. M had only mild limitations in his ability to adapt or manage himself. The ALJ acknowledged that Mr. M reported difficulty handling change and managing stress, but noted that Mr. M could handle self-care, personal hygiene, and care for his pet based on his function report. [DE 12 at 568-578]. The ALJ also referenced Dr. Bingi's observation that Mr. M had appropriate grooming and hygiene and had no problems with temper control. [DE 12 at 25]. Ultimately, the ALJ decided that Mr. M's mental impairments caused no more than a "mild" limitation in any of the functional areas, and that the evidence does not otherwise indicate there is more than a minimal limitation in Mr. M's ability to do basic work activities.

The ALJ also cited to findings from Dr. Bingi's report when discussing the persuasiveness of the medical opinions in the record. Specifically, the ALJ discussed Dr. Bingi's report when considering the persuasiveness of the opinions provided by the State Agency psychological consultants, Drs. Ann Lovko, Ph.D. and J. Gange, Ph.D. Both found that Mr. M had no severe mental impairment, and the ALJ found these opinions persuasive because they were consistent with the objective medical evidence in the record. In support of this consistency finding, the ALJ referenced Dr. Bingi's observations that Mr. M presented as bright and insightful, and that Mr. M had adequate judgment, reasoning, verbal skills, memory, and mathematical skills at the evaluation.

### 3.   Mr. M's Arguments for Remand

Mr. M now alleges that the ALJ failed to properly evaluate Dr. Bingi's testimony such that remand is required. Mr. M first contends that Dr. Bingi's report is a medical opinion under SSA regulations and that the ALJ improperly relied on opinions from the state agency psychologists to discount Dr. Bingi's opinion. Next, Mr. M contends that the ALJ failed to address certain evidence favorable to a finding of disability.

Mr. M's first arguments hinge on his characterization of Dr. Bingi's evaluation and report as a medical opinion under 20 C.F.R. § 404.1520c, so the Court addresses this issue first.

### a.   Dr. Bingi's Report as a Medical Opinion

On January 18, 2017, SSA amended its rules about the evaluation of medical opinion evidence for claims filed on or after March 27, 2017. Under the "old rule," a treating physician's medical opinion is entitled to controlling weight so long as it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). However, for claims filed after March 27, 2017, such as Mr. M's claim, the "new" rules dictating how an ALJ is to evaluate medical opinion evidence are set out in 20 C.F.R. § 404.1520c. The regulations no longer give controlling weight to treating physicians. *See id.* ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . ., including those from your medical sources.") Instead, the regulations now require an ALJ to determine how persuasive a medical source's opinion is upon analysis of these factors: supportability; consistency;

10

relationship with the claimant—including the length of the treatment relationship, frequency of examination, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; and specialization. 20 C.F.R. § 404.1520c(c)(1)–(5). The most important factors when assessing the persuasiveness of a medical opinion are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2).

Here, the ALJ did not treat Dr. Bingi's report as a medical opinion and, as such, did not discuss the persuasiveness of Dr. Bingi's report in accordance with the regulations for medical opinions. Whether this requires remand depends on whether Dr. Bingi's qualifies as a medical opinion under SSA regulations. Under 20 C.F.R. § 404.1513(a), a "'medical opinion' is distinct from 'objective medical evidence,' which concerns 'medical signs, laboratory findings, or both." *Jason M. v. Kijakazi*, No. 1:20-CV-03121-MG-SEB, 2022 WL 2071096, *5 (S.D. Ind. June 9, 2022) (quoting § 404.1513(a)(1)). To qualify as a medical opinion, a statement in the record must satisfy two elements: (1) it must be a statement from a medical source explaining what claimant could still do despite his limitations; and (2) it must express the claimant's impairment-related limitations or restrictions in terms of his ability to perform certain work demands. *Wallender v. Saul*, No. 20-CV-808-SCD, 2021 WL 734098, at *6 (E.D. Wis. Feb. 25, 2021). Without these elements, evidence is not considered a medical opinion, and an ALJ has no duty to examine or evaluate such evidence using the factors in 20 C.F.R. § 404.1520c. *Jason M.*, 2022 WL 2071096, at *5 (citing *Kernstein v. Kijakazi*, 2021 WL 5356103, at *3 (N.D. Ind. Nov. 17, 2021)).

11

Even though Mr. M was referred to Dr. Bingi for an evaluation by the Disability Determination Bureau, Dr. Bingi's report does not satisfy the two elements required for a medical opinion. Notably, the report fails to discuss Mr. M's limitations in terms of his ability to perform certain work demands. *Wallender*, 2021 WL 734098, at *6. Rather, the report is largely a record of Mr. M's complaints and Mr. M's responses to a mental examination. Although the report does include Dr. Bingi's broad initial diagnostic impressions, they are general and non-work specific. For instance, Dr. Bingi's report provides that Mr. M "comes across as bright and insightful. On the mental status exam his judgement, abstract reasoning, verbal skills, fund of general information, long-term memory and math skills appear to be adequate." [DE 12 at 528]. Without more in the report, these findings do not express Mr. M's limitations as to the demands of work. Accordingly, as the report does not qualify as a medical opinion, the ALJ had no duty to examine or evaluate Dr. Bingi's evaluation in accordance with the supportability and consistency factors in 20 C.F.R. § 404.1520c. *Jason M.*, 2022 WL 2071096, at *5.

Mr. M also objects to the ALJ's reliance on the medical opinions issued by the state agency psychological consultants, Drs. Ann Lovko and J. Gange, contending that the ALJ's reliance on these non-examining opinions fail to adequately provide for the ALJ's rejection of Dr. Bingi's opinion. This argument is similarly unpersuasive due to its characterization of Dr. Bingi's report as a medical opinion. It also appears to rely on the "old" regulations for medical opinions. As discussed, post March 27th, 2017, SSA regulations require the ALJ to discuss the persuasiveness of a medical opinion by discussing certain factors. The regulations no longer rely on distinctions between

12

treating, examining, and non-examining medical sources. *See* 20 C.F.R. §§ 404.1520c(a), (b). Accordingly, the Court cannot find that this argument requires remand.

> **b.      Whether the ALJ "Cherry-Picked" Findings from Dr. Bingi**

Mr. M also alleges that the ALJ erred by ignoring evidence from Dr. Bingi's report that would support a finding of disability. Specifically, Mr. M contends that the ALJ ignored Dr. Bingi's diagnostic impression of "Major Depression, Recurrent, Severe" and failed to address other symptoms of depression noted by Dr. Bingi in the decision. Mr. M contends that the ALJ's failure to address these findings and their seriousness amounts to impermissible "cherry-picking." *Denton*, 596 F.3d at 425. Mr. M further maintains that, because the ALJ ignored this evidence supporting a finding of severe depression, the ALJ's decision erroneously discounted this impairment at Step Two such that remand is required.

The Commissioner concedes that the ALJ did not mention this portion of Dr. Bingi's report in the decision but contends that the ALJ need not address every piece of evidence in the record as long as she provides a logical bridge between the evidence and her reasoning. *O'Connor-Spinner*, 627 F.3d at 618. Here, the ALJ did discuss findings from Dr. Bingi's report and other medical evidence to determine that Mr. M's depression was non-severe at Step Two. The ALJ explained how these findings in the record supported her RFC analysis, finding at most mild limitations relating to mental functioning, thus providing the necessary "logical bridge" between the evidence on record and her conclusion. *Scott*, 297 F.3d at 595.

In addition to the additional objective medical evidence discussed by the ALJ, the ALJ also discussed the persuasiveness of the State Agency Psychological Consultants' medical opinions. Both consultants reviewed Dr. Bingi's report as part of their opinion that Mr. M's mental impairments were nonsevere [*See* DE 12 at 88; DE 12 at 101]. Notably, both of the State Agency Psychological Consultants' acknowledged receipt of Dr. Bingi's report and explicitly noted Dr. Bingi's diagnostic impression of "MDD recurrent severe, GAD" as part of additional explanation. [DE 12 at 92; DE 12 at 106]. Both consultants also noted that Mr. M reported symptoms of depression and anxiety as well as difficulty with losses. [*See id.*]. However, both still found that Mr. M's mental impairments were not severe. The ALJ discussed that she found these opinions persuasive because of their consistency with Dr. Bingi's findings. Based on this, the Court cannot find that the ALJ's failure to address the severe depression diagnosis or other evidence of depressive symptoms directly in the decision amounted the ALJ ignoring an entire line of evidence contrary to the decision. Accordingly, the ALJ still provided substantial evidence that Mr. M's depression nonsevere at Step Two.

Moreover, the existence of an impairment or a diagnosis is not the determinative issue in these proceedings. Rather, the determinative issue is the impact such impairments have on Mr. M's ability to engage in work related activities. *See Melanie W. v. Saul*, No. 1:19-cv-403, 2020 WL 3056309, at *4 (N.D. Ind. June 2, 2020). The mere diagnosis of an impairment, even that of major depression, does not establish that the impairment affects the individual's ability to perform basic work activities. *Johnson v. Colvin*, No 2:13-cv-138-PRC, 2014 WL 4722529, at 4* (N.D. Ind. Sept. 22, 2014). Although

Dr. Bingi did mention this as a diagnostic impression in his report, Dr. Bingi did not opine as to any specific mental functional limitations. Nor does Mr. M point to any other evidence on the record that would support a finding that Mr. M's depression and other impairments were severe. While Dr. Bingi did observe that Mr. M appeared lethargic, lacking energy, demonstrated severely depressed mood, and was not engaging, these observations were never tied to Mr. M's work abilities. [DE 16 at 6].

Mr. M also contends that the ALJ's analysis is problematic because it resulted in a determination that his depression is non-severe, which is "nonsensical" given Dr. Bingi's diagnostic impression of "Major Depression, Recurrent, Severe." [DE 16 at 6]. Mr. M cites *O'Connor-Spinner v. Colvin*, 832 F.3d 690 (7th Cir. 2016) to support his contention that the ALJ's non-severe finding at Step Two is "nonsensical" given Dr. Bingi's diagnosis. But the Court cannot find Mr. M's reference to *O'Connor-Spinner* persuasive here.

In *O'Connor-Spinner*, the claimant's treating medical providers concluded that her depression was a severe impairment, and the record also included several occurrences suggesting serious depressive symptoms, including suicidal thoughts and staying in bed for multiple days at a time. For instance, the record included documentation of an episode where the claimant angrily discarded her medication, which prompted the claimant's husband to remove all weapons from their house in fear of their safety. *O'Connor-Spinner 832 F.3d at 693*.  Moreover, the claimant's claim had a long history before SSA and the court, as the claimant had applied for DIB and SSI several times since 2001. In 2010, the Court of Appeals had remanded her 2004 denial of

benefits because, although the ALJ on her first hearing had found that the claimant's depression was a severe impairment, there two errors relating to the ALJ's assessment of the impairment. *Id.* at 691.

Yet despite the Court's directive regarding the two errors made by the ALJ, the ALJ on remand proceeded to "contradict[] his colleague and declare[] that O'Connor-Spinner's depression is not, and never has been, a severe impairment." *Id.* In doing so, the ALJ ignored evidence of serious symptoms in the decision, and, rather than relying on the opinions from the claimant's treating medical providers, the ALJ relied on opinions from two state agency consultants who did not examine the claimant. The Seventh Circuit thus stated that the non-severe finding was "nonsensical given that the diagnosis, by definition, reflects a practitioner's assessment that the patient suffers from 'clinically significant distress or impairment in social, occupational, or other important areas of functioning.'" *Id.* (internal citation omitted). The nonsensical nature of the ALJ's determination was all the more cogent given that six years had passed since the claimant's original hearing on her application, and she supplemented the record with additional evidence of her depression during the extended period.

But here, as discussed, Dr. Bingi's evaluation does not qualify as medical opinion under SSA regulations. Moreover, Dr. Bingi's report contains findings that suggest less serious symptoms than those present in *O'Connor-Spinner.* Although Dr. Bingi noted that Mr. M appeared lethargic, lacking energy, demonstrated severely depressed mood, and was not very interpersonally engaging, Dr. Bingi also observed that Mr. M appeared to be "bright and insightful" and to have "adequate" mental functioning. *Id.*

This starkly contrasts with the suicidal and depressive episodes observed over a lengthy period of time in *O'Connor-Spinner*. Without more from Mr. M to demonstrate that *O'Connor-Spinner* is analogous to his case, the court cannot find that the Court's analysis of a severe depression diagnosis in *O'Connor-Spinner* also warrants remand here. *See Fortenberry v. Berryhill,* No. 3:16CV648-PPS, 2017 WL 5477170, at *6 (N.D. Ind. Nov. 14, 2017)* ("[Claimant]" has the burden to demonstrate a reversible error in the Commissioner's adverse decision. That burden is not met by citing an issue identified in other cases and then merely asserting, without demonstrating, that an analogous error is present in [his] case.")

### B.    The ALJ's Treatment of Mr. M's Subjective Symptoms

Next, Mr. M raises several challenges to the ALJ's subjective symptom analysis. When crafting a claimant's RFC, an ALJ must follow a two-step sequential process to determine whether a claimant's symptoms can be accepted as consistent with objective medical evidence and other evidence. First, the ALJ must determine whether there are underlying medically determinable mental or physical impairments that could reasonably be expected to produce the claimant's pain or symptoms. Second, if there are underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ must then evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. *See 20 C.F.R. § 416.929(a).* The ALJ evaluates the intensity, persistence, and limiting effects of symptoms by considering subjective statements about symptoms and pain, as well as

any description medical sources and other nonmedical sources provide about how these symptoms affect a claimant's ability to work. *See* 20 C.F.R. § 404.1529(a).

This analysis must focus on the extent to which the symptoms reduce the individual's capacity to perform work-related activities. *Wade v. Berryhill*, No. 2:17-CV-278, 2018 WL 4793133, at *10 (N.D. Ind. Oct. 4, 2018) (citing SSR 16-3p). The ALJ must also consider the existence of any inconsistencies in the evidence and the extent to which there are any conflicts between a plaintiff's statements and the evidence in the record. 20 C.F.R. § 404.1529(c)(4). Accordingly, a claimant's alleged symptoms are determined to diminish their capacity to work "to extent that [the claimant's] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical and other evidence." 20 C.F.R. § 404.1529(c)(4). So long as the ALJ gives specific reasons supported by the record, the Court will not overturn this determination unless it is "patently wrong." *See Deborah M. v. Saul*, 994 F.3d 785, 789 (7th Cir. 2021).

Here, Mr. M testified that he could only sit still for about twenty minutes at a time, could only stand and walk for about twenty minutes, and needed to lie down for three hours per day to relieve his pain. [DE 12 at 25]. He also reported that he had trouble getting to sleep at night and often woke through the night because of pain. [DE 12 at 25]. Mr. M also reported trouble lifting, walking, and standing which would limit him to no more than a sedentary level of work activity. *Id.* The ALJ did find that Mr. M had underlying medically determinable impairments that could reasonably cause the reported symptoms. *Id.* However, the ALJ then determined that there was not sufficient

18

objective medical evidence to substantiate the severity of the pain and degree of functional limitations alleged by Mr. M. [DE at 26]. Instead, the ALJ found that the record supported an RFC of light work with certain additional limitations.

Mr. M now argues that ALJ made several errors when addressing Mr. M's subjective symptoms. First, Mr. M argues the ALJ failed to address favorable opinion evidence from state agency reviewers that substantiate the severity of his pain and the degree of his limitations. Second, Mr. M argues that the ALJ erroneously "played doctor" by failing to have two 2020 MRIs in the record reviewed by a medical professional. Finally, Mr. M disputes several reasons given by the ALJ to explain why certain medical evidence did not substantiate the severity and intensity of his symptoms. The Court addresses each argument in turn.

### 1.    Favorable Findings in Medical Opinions

Mr. M first contends that the ALJ failed to confront the favorable findings noted in the opinions provided by state agency reviewers Drs. Brill and Montoya. The state agency reviewers found that Mr. M's symptoms included: (1) pain; (2) malaise; (3) sustained concentration, and persistence limitations; and (4) social interaction limitations. Their opinions also noted that one or more of Mr. M's medically determinable impairments could reasonably be expected to produce Mr. M's reported pain or symptoms, and that his "statements about the intensity, persistence, and functionally limiting effects of the symptoms [are] substantiated by the medical evidence alone." [DE 16 at 9].  Mr. M argues that these findings account for favorable evidence that the ALJ failed to address.

But the Court cannot find that this warrants remand. First, although Drs. Brill and Montoya did state that Mr. M's subjective symptom reports were substantiated by the medical evidence, they also concluded that Mr. M was not disabled and retained an RFC for light work. The ALJ also evaluated the opinions of Drs. Brill and Montoya in the decision and found them to be persuasive, also finding that Mr. M retained an RFC for light work with certain limitations. Without more, the Court cannot find that the ALJ failed to confront a line of evidence contrary to the decision, especially when the ALJ discussed and relied on the consultants' medical opinions as part of the RFC determination. *See Denton*, 596 F.3d at 426; *see also Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir. 2009).

### 2.    2020 MRI Evidence

Mr. M's next argument maintains that the ALJ erred by addressing two spinal MRIs from August and September 2020 in the decision without first submitting them for medical expert review. *See Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018); *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014). Mr. M contends that the ALJ impermissibly "played doctor" by interpreting the MRI results on his own, and as such, "the Court cannot be assured of the ALJ's conclusion that there was a lack of objective medical evidence supporting [Mr. M's] symptom reports." [DE 16 at 10].

The ALJ summarized the findings of these 2020 MRIs as follows:

An August 2020 lumbar spine MRI found slight spinal stenosis secondary to a small disc herniation at T11-T12, minor spinal and foraminal stenosis secondary to generalized disc bulging without frank disc herniation or secondary nerve root compression at L3-L4, and mild spinal stenosis and mild bilateral foraminal stenosis secondary to mild generalized disc bulging and small osteophytes at L5-

S1. Incidental findings included mild congenital hypoplasia of portions of the posterior vertebral bony elements at L5, along with a possible left L5 pars interarticularis defect without secondary anterolisthesis (11F).

The claimant's September 2020 thoracolumbar spine MRI found a disc herniation but no stenosis at T11-T12; mild disc height narrowing with desiccation and annular tears at L3-L4; diffuse posterior annular bulging at L4-L5; and disc desiccation with posterior annular bulging resulting in mild bilateral foraminal stenosis at L5-S1. Other findings included a moderate to large benign hemangioma involving the majority of the left half of the L2 vertebral body, a mildly anomalous appearance of the posterior L5 arch, and a questionable irregular of the left pars suspicious for spondylolysis (12F).

[DE 12 at 28].

While it is the responsibility of the ALJ to making findings "about what the evidence shows," 20 C.F.R. § 404.1520b, "playing doctor" is "a clear no-no." *Goins*, 764 F.3d at 680. An ALJ can impermissibly "play doctor" by "interpret[ing] new and potentially decisive medical evidence without medical scrutiny." *McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (internal quotation marks omitted). That said, "[n]ot all new evidence will necessitate remand." *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021), *as amended on reh'g in part* (June 21, 2021). The question is whether the new evidence "changed the picture so much that the ALJ erred by continuing on an outdated assessment by a non-examining physician and by evaluating himself the significance of [the subsequent] report, or whether the updated information was minor enough that the ALJ did not need to seek a second opinion." *Id.* (internal citation and quotation mark omitted). Put another way, "the ALJ must seek an additional medical opinion if there is potential decisive evidence that postdates the state agency consultant's opinion." *Id.* at 888 (internal citation omitted).

But Mr. M has not argued that these MRIs add to the intensity and persistence of pain or other subjective phenomena from what was provided by the older medical evidence, or that these MRIs contradicted the other evidence on these impairments. Moreover, the MRI demonstrate the existence of Mr. M's impairments, and generally noted only mild findings. Thus, the Court cannot find that these 2020 MRIs drastically changed the picture or were potentially decisive such that it was error for the ALJ to discuss with them without a second opinion. *See Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017).

The ALJ also evaluated considerable evidence beyond the 2020 MRIs in crafting the RFC for Mr. M's spinal impairments. For instance, the ALJ considered Mr. M's own statements about the effectiveness of treatment and pain relief including statements that the "chiropractic treatments provided temporary relief of his back" and his reports that in April 2019, Mr. M's "neck was much better with treatment, but he was not doing home exercises as recommended." [DE 12 at 25]. The ALJ also noted times when Mr. M reported only slight low back pain and tightness. [DE 12 at 29]. The ALJ also discussed an examination and x-ray conducted by Dr. Winters in October 2019, where Dr. Winters further stated that a lumbar spine X-ray demonstrated "some" disc degeneration and facet joint arthritis, while cervical spine X-rays demonstrated degeneration. [DE 12 at 27].

Even though the MRIs were new, given the nature of the findings and the other evidence considered by the ALJ in crafting the RFC, they were not inconsistent with other evidence subjected to medical review. The MRIs did not considerably change the

circumstances of the case. Thus, without more from Mr. M, the Court cannot find that this requires remand.

### 3.    Other Statements in the Decision

Finally, Mr. M contends that the ALJ's decision includes several unsupported statements about his treatment plans and pain management regimens, and that the ALJ impermissibly relied on these findings to discount Mr. M's testimony about the severity of his symptoms. Specifically, Mr. M points out the following statements and contends each require remand:

> -He did not follow-up on physical therapy or pain management (Tr. 25);
> -His treatment was minimal as he took over-the-counter medications, ice, heat, and chiropractor treatments (Id.);
> -Although he later said his chiropractic treatment was ineffective, contemporaneous records show good results (Id.);
> -Dr. Winters did not see a need for surgery (Id.);
> Physical exams tended to elicit mild to moderate responses (Id.); and
> -The x-rays and MRIs have shown mild to moderate degeneration of the cervical spine and lumbar spine (Id.).

[DE 16 at 10].

Yet most of Mr. M's arguments as to why these statements require remand are cursory and undeveloped, as Mr. M merely cites to similar issues identified in other cases without explaining how this issue makes the ALJ's decision on his claim erroneous. *See Fortenberry*, 2017 WL 5477170, at *6. Such undeveloped arguments are considered waived. *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1992); *Handford ex rel. I. H. v. Colvin*, 2014 WL 114173, at *11 (N.D. Ill. 2014) (applying *Berkowitz* to underdeveloped arguments in a social security appeal). Still, even considering Mr. M's arguments, they are unpersuasive.

23

Mr. M challenges the ALJ's statements that "Dr. Winters did not see a need for surgery" as well as two other statements that Mr. M's clinical signs were mild to moderate. Mr. M does not directly dispute the substance of these findings but contends that depression could have caused Mr. M's lethargy and need to lie down, citing to *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006). While the Court in *Mendez* did state that "someone with severe depression" could be "abnormally sleepy and listless and doze[] off frequently," Mr. M makes no further argument to demonstrate how this case is relevant here. *See id.*

Next, as to the ALJ's statement that Mr. M failed to follow through with physical therapy, Mr. M contends that the ALJ mischaracterized the record. Mr. M states that he actually completed the recommended physical therapy regimen and was told he was "good to go." [DE 19 at 14]. Moreover, Mr. M contends that, even if he had failed to complete physical therapy, the ALJ should have inquired why the treatment ended. *Craft v. Astrue*, 539 F.3d 668, 679-80 (7th Cir. 2008). But the Court cannot find that this error invalidates the subjective symptom analysis, as it was only a small part of the overall analysis. *See McKinzey v. Astrue*, 641 F.3d at 884, 890-91 (7th Cir. 2011). The ALJ also found that the severity of his symptoms was not substantiated based on other evidence, such as contradictory statements made by Mr. M in his symptom reports and the opinions given by state agency reviewers Drs. Brill and Montoya. [DE 12 at 29]. Given the whole of the ALJ's decision, the Court cannot find that the ALJ's determination was patently wrong, a high bar that is not met by the error made in the ALJ's analysis here. *Wilder,* 22 F.4th at 653; *see Elder,* 529 F.3d at 413-14 ("only when the

ALJ's determination lacks any explanation or support... will [we] declare it to be patently wrong and deserving of reversal.")

Mr. M also argues that the ALJ's statement regarding Mr. M's use of over-the-counter pain medications cannot serve as compelling evidence that his pain was not as severe as reported. Mr. M contends that his history with alcohol addiction further mitigates against his use of pain medications, which can be addictive. In support, Mr. M cites to *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000) and SSR 16-3p. While it is true that an ALJ must explore the claimant's reasons for the lack of medical care before drawing a negative inference, Mr. M presents no arguments to demonstrate that Mr. M relied on only over-the-counter medications due to his history of addiction.

Nor does Mr. M make any argument that otherwise demonstrates that the precedent established by *Green* requires remand here. In *Green*, the claimant reported severe pain and limitations due to emphysema. 204 F.3d at 781. After a lung surgery, the claimant visited multiple pain clinics and received two intercostal nerve blocks, a surgical procedure that alleviates pain by killing the nerves that transmit the sensation that triggers a pain reaction in the brain. 204 F.3d at 782. The claimant had also previously used codeine for pain and had been offered a third intercostal nerve blocker because of the addictive nature of codeine. *Id.* Despite this extensive history of pain management, the ALJ instead focused on the claimant's current use of only over-the-counter pain medication and found that it resulted in "reasonably good pain control." *Id.* As such, the ALJ discounted the claimant's testimony regarding the severity of his pain and ultimately found that the claimant was not disabled. Here, while the record

does show that Mr. struggled with alcoholism and addiction in the past, no testimony, medical evidence, or medical opinions on the record mention that in conjecture with pain medication or provide any rationalization for the lack of prescribed heavy medication. Without more, the Court cannot find that this statement requires remand.

Finally, Mr. M also challenges the ALJ's statement that Mr. M had said chiropractic treatment was ineffective while contemporaneous records show good results. Mr. M does not dispute that he reported mild improvement in June 2019 but contends that this finding is not substantial evidence because pain often waxes and wanes. However, the Court cannot find this statement unreasonable, as Mr. M even concedes that he stated that he saw improvements in June 2019. *See Shramek v.* Apfel, 226 F.3d 809, 811 (7th Cir. 2000) (observing that "we give [an ALJ's] opinion a commonsensical reading rather than nitpicking at it") (quoting *Johnson v. Apfel*, 189 F.3d 561 (7th Cir.1999)). Moreover, the ALJ must also consider the existence of any inconsistencies in the evidence and the extent to which there are any conflicts between a plaintiff's statements and the evidence in the record. 20 C.F.R. § 404.1529(c)(4). Without more from Mr. M to show a record of "waxing and waning" pain, the Court cannot find that the ALJ's statement requires remand here.

## V.      CONCLUSION

For the reasons stated above, the ALJ's decision is supported by substantial evidence and does not warrant remand. Accordingly, the Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 26th day of May 2023.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge